**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RANDY WEINBERG,                           :
     Plaintiff,                             :         CIVIL CASE NO.
                                            :         3:21-CV-00155 (JCH)
v.                                        :
                                            :
STATE OF CONNECTICUT                      :
DEPARTMENT OF REVENUE,                    :         MARCH 31, 2022
SERVICES AND MARK D. BOUGHTON,            :
     Defendants.                            :

**RULING ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 20)**

**I.      INTRODUCTION**

Plaintiff Randy Weinberg brought this action on February 5, 2021, seeking, <u>inter alia</u>, a declaratory judgment that Conn. Gen. Stat. section 12-651 is unconstitutional and a permanent injunction enjoining defendants "from trying to collect any sum assessed against the Plaintiff in any fashion" under the same statute.  Compl. at ¶ 41 (Doc. No. 1).  In his Complaint, he alleges that section 12-651 impermissibly targets individuals who illegally possess drugs and "purports to impose a tax on the possession of drugs in the amount of $3.50 for each gram of marijuana, $200 [ ] on each gram of any other controlled substance, or $2,000 [ ] on each fifty dosage units of any controlled substance that cannot be measured by weight."  <u>Id.</u> at ¶¶ 18-19.  Because the tax is "punitive" and "imposes fines . . . grossly disproportional to the offenses that it seeks to punish", he also alleges that – both facially and as applied – it violates the Double Jeopardy Clause the Fifth Amendment (Count One); the Due Process Clause of the Fourteenth Amendment (Count Two); and the Excessive Fine Clause of the Eight Amendment (Count Three).  <u>Id.</u> at 23-40.

Defendants State of Connecticut Department of Revenue Services ("CT DRS") and Mark D. Boughton, sued in his official capacity as the Commissioner of CT DRS, have moved to dismiss Weinberg's Complaint for lack of subject matter jurisdiction and because his action is time-barred.  See Mot. to Dismiss (Doc. No. 20); Mem. of Law in Supp. of the Defs.' Mot. to Dismiss ("Defs.' Mem.) (Doc. No. 20-1); Reply Brief in Supp. of the Defs.' Mot. to Dismiss ("Defs.' Reply") (Doc. No. 23). Weinberg opposes that Motion.  See Mem. of Law in Opp'n to the Defs.' Mot. to Dismiss ("Pl.'s Mem.") (Doc. No. 21).

For the reasons discussed below, the Motion to Dismiss is denied.

## II.   ALLEGED FACTS

In 1998, plaintiff Randy Weinberg was convicted of drug possession with the intent to distribute.  Compl. at ¶ 6.  He was incarcerated for this offense and, after violating probation in 2001, was sent back to prison.  Id.  In 2002, while he was still in prison, CT DRS sent him a notice that it had assessed a tax penalty on him for the drugs it claimed were in his possession in 2001, pursuant to section 12-651.  Id. at ¶ 7. Upon receiving the notice, Weinberg talked to fellow inmates, who had never heard of the tax.  Id. at ¶ 8.  He also "talked to the state who would only tell him that, regardless of what he did, they would get the money one way or another."  Id. at ¶ 9.

Weinberg was finally released from prison in 2004.  Id. at 10.  Following his release, he attempted to turn his life around, attending college, maintaining a 4.0 GPA, getting a job, and avoiding folks who had historically had a bad influence on him.  Id. CT DRS, however, began garnishing his wages to satisfy his outstanding tax obligations.  Id. at ¶ 11.  Weinberg alleges that this "left [him with] less than $200 per week to live on."  Id.  After four years of struggling with this burden, he says he had "no

other option[ ]" but to "turn[ ] back to dealing drugs again in an effort to meet his basic human needs."  Id. at ¶ 12.

Weinberg was soon after arrested and convicted for drug dealing offenses in 2010.  Id. at ¶ 13.  He was incarcerated until 2013, when he was released and again tried to reform his life.  Id. at ¶¶ 13-14.  He found another job, bought a house, and "became a productive and honest member of society."  Id. at ¶ 14.  Still, his tax liability lingered.  Due to interest and penalties, Weinberg alleges he now owes $124,344.38, and that the state is actively trying to collect that amount.  Id. at ¶ 15.  For instance, in 2019, the defendants issued him a "Certification for Tax Warrant", and subsequently used that document to forcibly take $1,000 from his bank account in 2020.  Id. at ¶ 16.  A year later, on January 5, 2021, they notified him that they had attached a real estate tax lien on his home and threatened to garnish his wages again.  Id. at ¶ 17.  In the face of these actions, Weinberg filed this lawsuit in February 2021.

## III.    STATUTORY AND PROCEDURAL BACKGROUND

In 1991, Connecticut passed into law "An Act Imposing a Tax on Marijuana or any Controlled Substance Produced, Transported, or Acquired by a Dealer", also known as H.B. No. 5033.[1]  See 1991 Conn. Legis. Serv. P.A. 91-397 (H.B. 5033) (WEST).  H.B. No. 5033 imposed a tax "on any marijuana or controlled substances purchased, acquired, transported or imported into the state", with the tax "due and payable immediately upon acquisition or possession in this state by a dealer."  Id. at § 2.  For controlled substances "not sold by weight . . . each fifty dosage units" were taxed at a

---

[1] When citing to the provisions of the Act, the court cites to "H.B. No. 5033" to refer to the original law codified at section 12-651, and to the current version of the law codified at 12-650.  As discussed below in this section, section 12-651 and the Act as a whole was repealed in 2021.  Thus, citations to section 12-651 specifically would be in error because that section is no longer in effect.

rate of "two thousand dollars."  Id.  The tax exempted "persons lawfully in possession of marijuana or a controlled substance", and also imposed "a penalty of ten per cent of the deficiency or fifty dollars, whichever amount is greater, and interest at the rate of one and one-fourth per cent per month from the due date of such tax to the date of payment."[2]  Id. at § 6, 9.  Moreover, "any dealer who violate[d] any provision of th[e] act" was required to "pay a penalty of one hundred per cent of the tax in addition to the tax imposed pursuant to section 2", and to be "fined not more than ten thousand dollars or imprisoned not more than six years or both."  Id. at § 11.  H.B. No. 5033 was codified as Conn. Gen. Stat. section 12-650 et seq.

In his Complaint, Weinberg alleges that "[t]he legislative history of the statute is permeated with statements of legislative intent to punish."  Compl. at ¶ 21.  He provides two examples.  The first is a statement from Representative John W. Thomas, in which he laments that "the law does not permit law enforcement officials to reach . . . whatever resources [drug dealers] may have as cash resources, other businesses and so on. This bill would allow law enforcement officials to reach beyond the immediate seizure and to attack criminals' assets, bank accounts, homes, property and so on."  Id.  The second, a statement from Representative G. Metsopoulos, is explicit about "the concept [of the law being] good because what you're doing is you're double-whacking the offender.  You're getting him with the jail term and you're getting him with any fines that he may incur through civil or legal offenses.  You're then getting him with the tax that 'he would have to pay' if he was selling this substance."  Id.

---

[2] Section 6, codified as Conn. Gen. Stat. section 12-655, was later amended to reduce the rate of interest from one and one-fourth percent to one per cent.  See 1995 Ct. ALS 26, 1995 Ct. PA 26 at § 36 (LEXIS).

Weinberg also alleges that the tax was inconsistently enforced.  <u>Id.</u> at ¶ 20.
Rather than supply the public with information to facilitate payment, he alleges,
defendants "have only created and supplied law enforcement with forms necessary to
refer people in possession of illicit drugs to them for summary assessment and
collection."  <u>Id.</u>  Stated differently, defendants have "not taken any steps to apply the law
on a general basis."  <u>Id.</u> at ¶ 22.  Instead, they have "selectively applied the statute to a
limited number of [ ] people."  <u>Id.</u>

Weinberg, of course, is one of these people.  Shortly after filing his Complaint, he
also filed an Emergency Application seeking a Temporary Restraining Order and a
Preliminary Injunction to "stay[ ] all efforts by [defendants] to collect or attempt to collect
any amount of the tax assessment that they ha[d] levied against [him]."  <u>See</u> Pl.'s
Emergency Application at 1 (Doc. No. 8).  A week later, however, Weinberg withdrew
his Motion after the parties agreed that defendants would "defer any enforcement
action, including wage garnishment and other collections activities, during the pendency
of this suit."  <u>See</u> Mot. to Withdraw Emergency Mot. for a T.R.O. and a Prelim.
Injunction at 1 (Doc. No. 13).

Defendants then filed their Motion to Dismiss.  While that Motion has been
pending, Governor Lamont signed into law June Special Session, Public Act No. 21-1.
<u>See generally</u> C.G.S.A., June Sp. Sess., P.A. 21-1; Press Release, Governor Ned
Lamont, Governor Lamont Signs Bill Legalizing and Safely Regulating Adult-Use
Cannabis (June 22, 2021), https://portal.ct.gov/office-of-thegovernor/news/press-
releases/2021/06-2021/governor-lamont-signs-bill-legalizing-andsafely-regulating-adult-
use-cannabis.  Section 173 of the Act repealed "[s]ections 12-651 to 12-660, inclusive

. . . of the [Connecticut] general statutes."  C.G.S.A., June Sp. Sess., P.A. 21-1, § 173.

In addition, section 130 of the Act repealed section 12-650 of the General Statutes and

substituted the following in lieu thereof:

> Notwithstanding the provisions of this chapter, revision of 1958, revised to
> January 1, 2021, any outstanding liabilities or assessments, or any portion
> thereof, made under said chapter related to the sale, purchase, acquisition
> or possession within the state or the transport or importation into the state,
> of marijuana, as defined in section 21a-240, shall be cancelled.  The
> Commissioner of Revenue Services may take any action necessary to
> effectuate the cancellation of such liabilities and assessments.   No
> cancellation of a liability or an assessment pursuant to this section shall
> entitle any person affected by such cancellation to a refund or credit of any
> amount previously paid or collected in connection with such liability or
> assessment.

Id. at § 130.  Both these changes were effective as of July 1, 2021.

In light of this change of law, the court directed the parties to file a Joint Status

Report addressing how, if at all, the repeal of H.B. No. 5033 affects their positions in the

current action, including whether or not the case is moot in whole or in part.  See Order

Regarding Defs.' Mot. to Dismiss at 2 (Doc. No. 24).  In response, the parties jointly

stipulated that, because "plaintiff's tax liability under Conn. Gen. Stat. § 12-651 stems

from the possession of controlled substances by a dealer other than marijuana . . . the

change in the law does not render any part of this case moot."  See Joint Status Report

at 1 (Doc. No. 25).  In other words, because Weinberg's tax liability stems from his

possession of a controlled substance that was not marijuana, and the amendment to

section 12-650 cancelled only tax liabilities connected to the possession of marijuana,

defendants will – aside from the agreed upon deferment during the pendency of this

action – continue to attempt to collect from Weinberg unless enjoined from doing so.

## IV.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  A plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence.  Id.  When determining whether to dismiss for lack of subject matter jurisdiction, a court may "consider[ ] evidence outside the pleadings."  See Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).  A court also "has discretion to hold a hearing to resolve factual disputes that bear on the court's jurisdiction."  Saleh v. Sulka Trading, 957 F.3d 348, 353 (2d Cir. 2020).  However, a court must otherwise "accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  Id.

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

7

V.     ANALYSIS

Defendants have moved to dismiss this action in its entirety on three grounds.

First, they argue that this court lacks subject-matter jurisdiction over Weinberg's claims

because "both the Tax Injunction Act ["TIA"], 2[8] U.S.C. [section] 1341, and the comity

doctrine bar claims for declaratory and injunctive relief which, if granted, would interfere

with a state's administration of its tax system."  Defs.' Mem. at 4.[3]  Their second

argument is a corollary of the first.  If the court finds that section 12-651 imposes a

punishment rather than a tax and, therefore, that neither the TIA nor comity divest the

court of jurisdiction, defendants contend that the Younger abstention doctrine would

then apply.  Id. at 9-10.  Finally, defendants also argue that Weinberg's action is barred

by the statute of limitations.  Id. at 10-11.  The court addresses each of these arguments

in turn.

    A.     Subject-Matter Jurisdiction

        1.     The Tax Injunction Act

The TIA provides that a "district court shall not enjoin, suspend or restrain the

assessment, levy or collection of any tax under State law where a plain, speedy and

efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  The Act,

passed in 1948, "is rooted in principles of federalism and [the] recognition of a state's

need to administer its own fiscal operations, and was written primarily to limit federal-

court interference with local tax matters."  Bernard v. Vill. of Spring Valley, N.Y., 30 F.3d

294, 297 (2d Cir. 1994).  "[T]he comity doctrine applicable in state taxation cases" is

---

[3] Both parties consistently refer to the TIA being codified at 26 U.S.C. § 1341.  See, e.g., id.; Pl.'s Mem. at 4.  This appears to be in error, as the TIA is codified in section 1341 of title 28 of the U.S. Code.

similar but "[m]ore embracive than the TIA" and "restrains federal courts from entertaining claims for relief that risk disrupting state tax administration."  Levin v. Commerce Energy, Inc., 560 U.S. 413, 417 (2010).  The principle of comity predated the TIA, and the Supreme Court has read the latter as "best understood as but a partial codification of the federal reluctance to interfere with state taxation."  Id. at 424 (internal quotations and citations omitted); see also Abuzaid v. Mattox, 726 F.3d 311, 315 n. 3 ("we have viewed [the TIA] as having a narrower scope than [ ] comity-based prohibitions").

The TIA's jurisdiction-stripping provision is not absolute.  "To determine whether the TIA strips [a] district court of jurisdiction" over a particular action, the court must first decide whether the tax in question is actually "a tax for the purposes of the TIA." Energy Nuclear Vermont Yankee, LLC v. Shumlin, 737 F.3d 228, 231 (2d Cir. 2013).[4] In that regard, courts have distinguished between archetypical revenue-generating taxes, on the one hand, and assessments aimed at punishment rather than taxation on the other.  As the Supreme Court has recognized, "'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.'"  Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 779 (1994) (quoting A. Magnano

---

[4] The Second Circuit has held that a second "condition[ ] must exist" as well "before the TIA can be invoked."  Hattem v. Schwarzenegger, 449 F.3d 423, 427 (2d Cir. 2006).  Not only must the tax in question be a tax for the purposes of the TIA, but the "state remedies available to [the] plaintiff[ ] must be plain, speedy and efficient."  Id.

Because the court concludes that Weinberg has pled facts sufficient to support a plausible claim that section 12-651 is a punishment rather than a tax, it does not reach the question of adequate state remedies.  See, e.g., Lynn v. West, 134 F.3d 582, 595 n. 14 (4th Cir. 1998) ("[b]ecause the Drug Tax is not a 'tax under State law,' we need not consider the [second] element, that is, whether [plaintiff] has a 'plain, speedy and efficient remedy' in state court").

Co. v. Hamilton, 292 U.S. 40, 46 (1934)); see also Travelers Ins. Co. v. Cuomo, 14 F.3d 708, 713 (2d Cir. 1993), rev'd on other grounds, New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645 (1995) ("most courts agree that [a]ssessments which are imposed primarily for revenue-raising purposes are 'taxes,' while levies assessed for regulatory or punitive purposes, even though they may also raise revenues, are generally not 'taxes'") (internal quotations and citations omitted).[5]  Thus, determining whether the TIA bars Weinberg's action here requires the court to analyze that exact question: has Weinberg pled facts sufficient to support a plausible claim that Connecticut's tax on illicit drugs "crosses that line" from tax to constitutionally suspect punishment?[6]  Kurth Ranch, 511 U.S. at 780.

While this presents a challenging question, the court concludes that he has.  In Kurth Ranch, the Supreme Court considered a similar Montana statute and held that it was "fairly characterized as a punishment" rather than a tax and, as such, "was the functional equivalent of a successive criminal prosecution."  Kurth Ranch, 511 U.S. at 784.  In doing so, the court articulated a complex, multi-factor test for courts to use in determining whether similar taxing schemes amounted to constitutionally suspect punishment by another name.

---

[5] In New York State Conference, the Supreme Court reversed and remanded the Second Circuit's decision in Travelers Ins. Co., but left its TIA analysis intact.  The Supreme Court noted that, on appeal, "neither party [had] challenge[d]" the Second Circuit's holding "that the injunctive remedy" in question "was not prohibited by the [TIA]."  New York State Conference, 514 U.S. at 653 n. 4.  As such, it had "no occasion to examine" that question.  Id.

[6] Whether Weinberg has pleaded facts to support a plausible claim that Connecticut's tax crosses the line into punishment is the correct standard to apply in the subject-matter jurisdiction context that the court faces here.   "[A]lthough the plausibility requirement is most commonly applied in the context of evaluating whether a complaint substantively states a claim for relief, there is little reason to suppose that it should not equally govern the evaluation of factual allegations that support federal subject matter jurisdiction."  Lapaglia v. Transamerica Casualty Ins. Co., 155 F. Supp. 3d 153, 155 (D. Conn. 2016).

10

First, the court built off its prior jurisprudence to frame its holding as a logical extension of precedent, with a particular focus on U.S. v. Halper, 490 U.S. 435 (1989).[7] In that case, the district court had determined that "a civil penalty 'more than 220 times greater than the Government's measurable los[s] qualified as punishment' that was barred by the Double Jeopardy Clause." Kurth Ranch, 511 U.S. at 777 (quoting Halper, 490 U.S. at 439).  The Supreme Court affirmed, holding that, in assessing the punitive nature of a sanction, "'the labels 'criminal' and 'civil' are not of paramount importance.'" Id. (quoting Halper, 490 U.S. at 447).  Rather, courts must "'assess[ ] the character of the actual sanctions imposed on the individual by the machinery of the state.'"  Id.  In making this determination, "the legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character."  Id.

By the same logic, the court held in Kurth Ranch that "a tax may similarly be characterized as punitive" and still be "subject to constitutional constraints."  Id. at 778. Although "[a]s a general matter, the unlawfulness of an activity does not prevent its taxation . . . at some point, an exaction labeled as a tax approaches punishment" and "is not immune from double jeopardy scrutiny simply because it is a tax."  Id. at 778-80. There is no one-size-fits-all approach to determine whether a particular tax "crosses that line" into punishment; rather, courts are instructed to conduct the multi-factor analysis set forth by the Kurth Ranch court to determine if it possesses the "unusual features . . . [that] set [it] apart from most taxes."  Id. at 780-81.

---

[7] The Supreme Court later abrogated its holding in Halper.  See Hudson v. U.S., 522 U.S. 93, 100-03 (1997).  Although the court noted that, for a variety of reasons, "Halper's deviation from longstanding double jeopardy principles was ill considered", it also reaffirmed the reasoning and multi-factor test in Kurth Ranch.  Id. at 102 n. 6.

The court looked at four specific factors in <u>Kurth Ranch</u>.  First, although "neither a high rate of taxation nor an obvious deterrent purpose automatically mark[ ] [a] tax as a form of punishment", those factors can "lend support to the characterization of [a] drug tax as punishment."  <u>Id.</u> at 781.  More importantly, the court in <u>Kurth Ranch</u> observed that the Montana tax was explicitly "conditioned on the commission of a crime" – that is, "the tax assessment" itself "not only hinge[d] on the commission of a crime, it also is exacted only after the taxpayer has been arrested for the precise conduct that gives rise to the tax obligation in the first place."  <u>Id.</u>  Because of this, "[p]ersons who have been arrested for possessing marijuana constitute[d] the entire class of taxpayers subject to the Montana tax."  <u>Id.</u> at 781-82.  Finally, the court also noted that the "[t]he Montana tax [was also] exceptional" because it "levied [the tax] on goods that the taxpayer neither owns nor possesses when the tax [was] imposed", since the drugs in question were "presumably <u>destroyed</u> . . . before the tax on them was assessed."  <u>Id.</u> at 783 (emphasis in original).

Applying those factors here leads the court to conclude that Weinberg has pled facts sufficient to support a plausible claim that section 12-651 is punitive in nature.  As an initial matter, drawing all reasonable inferences in Weinberg's favor, the rate of taxation that the <u>Kurth Ranch</u> court deemed "remarkably high" is comparable to the alleged tax liability at issue here.  <u>Id.</u> at 780.  In <u>Kurth Ranch</u>, the Supreme Court found that "the assessment was more than eight times the drug's market value", which was "at least consistent with" the tax having a "punitive character."  <u>Id.</u>  Though it is difficult to say with precision at this stage in the proceedings, the tax here appears to be in that same range.  Weinberg has represented that, upon information and belief, he was taxed

for his possession of OxyContin at a rate of $2,000 per fifty dosage units.  Pl.'s Mem. at 8.  He has also pointed this court towards a Department of Justice, National Drug Intelligence Center (NDIC) estimate of OxyContin prices in January 2001, around the time that the tax against Weinberg was first assessed.  Id. at n. 3 (citing Department of Justice, National Drug Intelligence Center, OxyContin Diversion and Abuse, https://www.justice.gov/archive/ndic/pubs/651/abuse.htm (Jan. 2001)).  According to the NDIC, the retail value of 50 tablets of 20mg OxyContin pills cost approximately $115 at a pharmacy and between $500 and $1,000 when purchased illegally in 2001.  See OxyContin Diversion and Abuse (listing the lower-end of the illicit retail price for a 20 mg tablet as $10 and the upper-end at $20).  Thus, once the 100% penalty was assessed for failure to immediately pay the tax, it is plausible that the combined tax and penalty – $4,000 – was approximately eight times the illicit market value of the drug, using the lower-end, $500 estimate for fifty 20mg tablets.[8]  See, e.g., Lynn, 134 F.3d at 590 (including a similar 100% penalty for failing to pay a drug tax into its Kurth Ranch analysis to conclude that "the effective rate of taxation [was] 1,600 percent, or sixteen times, the market value").  This is the same ratio the Supreme Court found to be "at least consistent with" the tax having a "punitive character" in Kurth Ranch.  Kurth Ranch, 511 U.S. at 780.  Moreover, on its face the statute taxes illegal drug possession at a rate similar to the statute in question in Kurth Ranch.  See, id. at 795 n. *

---

[8] Plaintiff urges the court to base its comparison of the value of the OxyContin and the assessed tax on the retail value of the drug when sold legally, i.e., the $400 price point for a 100-tablet bottle of 40 mg pills.  The court disagrees with this approach.  As defendants point out, the purpose of the statute is "to reach an illegal and 'underground economy.'"  Defs.' Reply at 5.  Where an illicit pill is five to ten times more expensive than a legal one, and the tax is aimed solely at the possession of those illicit drugs, it would be inconsistent to base an assessment of that tax's reasonableness on the price point of only the legal drugs.

(O'Connor, J., dissenting) (noting that 22 other states, including Connecticut in section 12-651, had made "a similar determination [to] tax marijuana at approximately the same rate" as the Montana statute found unconstitutional in Kurth Ranch); Covelli v. Crystal, 235 Conn. 539, 542-43, 548 (analyzing a tax of $511,262, not including interest, on plaintiff's possession of 1,250 grams of cocaine pursuant to H.B. No. 5033 and holding that the high rate of taxation in Kurth Ranch was also "present in Connecticut's scheme to tax illicit drugs").

Regardless of the precise disparity between the value of the drug and the amount of the tax, defendants do not dispute that the "rate of taxation" is "high" in this instance.  Defs.' Reply at 5.  They instead correctly point out that the high rate by itself "does not automatically mark the tax as a form of punishment."  Id.  Nor, of course, does the statute's "obvious deterrent purpose", although defendants do dispute this factor to some degree.  Kurth Ranch, 511 U.S. at 780.  While they concede that the deterrent presence is prominent, they stress that "the legislative history [also] indicates 'the [Connecticut] tax was [not] enacted solely for a punitive purpose.'"  Def.'s Reply at 5 (quoting Covelli, 235 Conn. at 551).  In making this argument, they rely heavily on Covelli, a 1995 case where the Connecticut Supreme Court upheld the same tax Weinberg challenges here as not violating the Double Jeopardy Clause after finding that it did not possess all of the same "unusual features" of the Montana tax in Kurth Ranch.[9] Id. at 548 (internal quotations and citations omitted).  In that case, the court found in its

---

[9] Although in Covelli the Connecticut Supreme Court considered and ultimately rejected the same Double Jeopardy Clause challenge to section 12-651 that Weinberg brings here, "[f]ederal courts are not bound to follow a state court's interpretation of the federal Constitution."  Oneida Indian Nation of New York v. Madison County, 665 F.3d 408, 435 (2d Cir. 2011).  Thus, this court is not bound by Covelli's Double Jeopardy analysis under Kurth Ranch in determining whether, at this stage, the TIA divests it of jurisdiction.

"examination of the legislative history of the act" that, "[w]hile it [was] beyond question that the tax was intended to some extent to act as a deterrent to participation in the drug trade, legislators [also] expressed the desire to address tax evasion in an underground economy . . . [and to] produce money for the state while imposing a burden on those who deal drugs." Id. at 551-52 (internal quotations and citations omitted).  Maybe so. However, in assessing the legislative history of the act, a court should not "undertake [its] examination . . . with blinders on regarding what the legislature intended it to mean." Id. at 555 (Katz, J., dissenting).  In that regard, Weinberg's Complaint and the legislative history of the Act indicate that it was the punitive purpose – rather than revenue-generating goals – that drove its passage.  See, e.g., supra at Section III (quoting Compl. ¶ 21); Pl.'s Ex. B at 14 (Doc. No. 21-2) (Representative Thompson stating that "the collection of money is part of the process, that's true.  A more important part of this legislation is really to put a crimp in the operation of the drug dealer").

Notwithstanding the clear intention in these remarks, however, Kurth Ranch makes clear that simply because H.B. No. 5033 taxes drug possession at an inordinately high rate and has legislative history stating it was enacted for punitive purposes does not by itself mean that it is a punishment rather than a tax.  Just as important for the court's analysis is whether the other Kurth Ranch factors are also present.

The next "unusual feature[ ]" identified by the Court was the fact that Montana's "so-called tax [was] conditioned on the commission of a crime", which the Court held was "significant of penal and prohibitory intent rather than the gathering of revenue."

15

Kurth Ranch, 511 U.S. at 781 (internal quotations and citations omitted).  It is here that the parties sharply disagree.

Weinberg asserts that, because section 12-658 explicitly exempts persons in lawful possession of a drug from paying the tax, the statute on its face is conditioned on the commission of a crime.  Pl.'s Mem. at 10.  Defendants again follow the Connecticut Supreme Court's ruling in Covelli, noting that the court found its way around this seemingly straightforward application of Kurth Ranch by rationalizing that section 12-658 was consistent with the statute's overall purpose of taxing a hard-to-reach underground economy and emphasizing other differences between the Montana and Connecticut laws.  Defs.' Reply at 5.  It is true that the two differ in important ways: for instance, "[t]he taxpayer" in Kurth Ranch had "no obligation to file a return or to pay any tax unless and until he [was] arrested", whereas the statute at issue here makes the tax "due and payable immediately upon acquisition or possession in [Connecticut] by a dealer", regardless of whether or not the dealer is arrested.  Kurth Ranch, 511 U.S. at 771 (emphasis added); H.B. No. 5033 at § 2.  This meant that, in Kurth Ranch, "[p]ersons who ha[d] been arrested for possessing marijuana constitute[d] the entire class of taxpayers subject to the Montana tax."  Kurth Ranch, 511 U.S. at 781-82. Defendants aver that the Connecticut statute is different because dealers have paid the tax before arrest by purchasing stamps "over the years."  Aff. Of John Biello, Defs.' Ex. C at ¶ 7 (Doc. No. 23-2).

While again a close question, Weinberg has the better argument here for two reasons.  First, defendants misunderstand how the Kurth Ranch Court applied this factor.  Whether there were taxpayers who paid the assessment pre-arrest did not drive

the court's analysis; rather, it was the fact that the "so-called tax [was] conditioned on the commission of a crime" that was itself "significant of penal and prohibitory intent rather than the gathering of revenue." Kurth Ranch 511 U.S. at 781 (internal quotations and citations omitted). Here, there is no debate that, on its face, the tax applies only to those who have committed a crime, i.e., possessed drugs illegally. Second, although the court also found that "the tax assessment . . . [was also] exacted only after the taxpayer ha[d] been arrested", at least one Circuit Court has been clear that "[t]he theoretical possibility that a drug dealer could voluntarily pay the Drug Tax does not take the tax out of the criminal penalty category." Lynn, 134 F.3d at 591. Indeed, in Lynn, the Fourth Circuit found that this third factor was present in a North Carolina statute nearly identical to the Connecticut one at issue here. Id. at 590-91. Defendants' vague statement that "stamps have been purchased over the years" does not change this conclusion. Aff. of John Biello at ¶ 7.[10] Weinberg has challenged section 12-651 both facially and as applied, and he alleged in his Complaint that the tax has been "only selectively applied [ ] to a limited number . . . of people who have been convicted for possession with intent to sell." Compl. at ¶ 22. He has also alleged that the application of the tax "depends wholly on referrals from law enforcement and criminal prosecutors

_____

[10] Indeed, Biello's Affidavit does not provide any detail to support his claim that, "to [his] knowledge", some stamps have been purchased since 1991. Nor does he provide any other pertinent information that could undermine Weinberg's allegations regarding how the tax is actually applied. Biello does not say how many stamps have been bought, what percentage of individuals convicted of drug crimes in Connecticut have been assessed the tax, or compare the amount of stamps that have been purchased to the amount of tax liability CT DRS has assessed against individuals only after they were convicted of a crime. It may be true that, following discovery, the undisputed facts show that the tax has not been selectively applied only against individuals convicted of drug possession crimes. However, at this stage, Biello's vague statement that, at some point since 1991, some stamps have been purchased provides little more than "[t]he theoretical possibility that a drug dealer could voluntarily pay the Drug Tax", which the Lynn court held would "not take the tax out of the criminal penalty category." Lynn, 134 F.3d at 591.

who, upon information and belief, rarely make those referrals and only do so when they seek to impose more punishment on a specific criminal defendant than a criminal court will [impose]." Id. at ¶ 30. "Accept[ing] as true all material facts [Weinberg has] alleged in [his] complaint and draw[ing] all reasonable inferences in [his] favor", he has pled facts to support a plausible claim that, both facially and as applied, "[t]he Drug Tax is still based on a criminal act" and thus the third factor in Kurth Ranch is also present here. Saleh, 957 F.3d at 353; Lynn, 134 F.3d at 591.

The fourth factor is also present for similar reasons. In Kurth Ranch, the court noted that the tax was "levied on goods that the taxpayer neither own[ed] nor possesse[d] when the tax is imposed. Indeed, the State presumably destroyed the contraband goods in th[at] case before the tax on them was assessed." Kurth Ranch, 511 U.S. at 783 (emphasis in original). Crucially, as discussed above, the Connecticut tax is "imposed" at the time the dealer first possesses the drugs, as opposed to the Montana statute which only assessed the tax following arrest. However, this difference is not a sufficient basis to distinguish Kurth Ranch at this stage. Again, Weinberg has alleged that, as applied, the tax is enforced only on those "convicted for possession with intent to sell" when the state "seek[s] to impose more punishment on [them] than a criminal court" will allow. Compl. at ¶¶ 22, 30. As applied, then, Weinberg alleges that the tax is levied only when the taxpayer no longer owns or possesses the drugs he is being taxed for, and only after the drugs have presumably been destroyed after conviction.

Moreover, "[t]he Kurth Ranch Court did not indicate that the features it cited were meant to be exclusive." Lynn, 134 F.3d at 592. It held only that the "unusual features"

of the Montana tax, "[t]aken as a whole", were "a concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment."  Kurth Ranch, 511 U.S. at 783.  Thus, even if one or more of the factors at play in Kurth Ranch are not present in another statute, Kurth Ranch did not hold that such a tax could not still cross the line into punishment.  This is particularly true when, as is the case here, the legislative history underpinning the tax is replete with statements revealing a clear punitive intent, and the rate of the tax and penalty is luridly high as to saddle plaintiff with what he alleges has amounted to a lifetime burden.

Because these first two Kurth Ranch factors are met, Weinberg has also plausibly alleged that the imposition of the tax is conditioned on the commission of a crime and that, when applied, it is assessed only on goods the taxpayer no longer owns nor possesses, the court concludes that Weinberg has plausibly alleged that section 12-651 is not a tax for the purposes of the TIA.  The TIA does not, therefore, divest the court of subject-matter jurisdiction at this stage.[11]

2.      Comity

This conclusion does not, however, necessarily resolve the question of whether tax comity precludes the court from hearing this action.  The principle of comity "bar[s] federal courts from granting injunctive and declaratory relief in state tax cases", as well as from "granting damages relief in such cases."  Fair Assessment in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100, 107 (1981).  More broadly, it "generally forbids federal

---

[11] The court again notes that this is a close question of law.  The Kurth Ranch factors are heavily fact-dependent, and it is possible that, following discovery, the undisputed factual record will not support this same conclusion.

courts from interfering with a state's enforcement of its tax laws."[12]  Abuzaid v. Mattox, 726 F.3d 311, 312 (2d Cir. 2013).  In this way, it is "[m]ore embracive than the TIA because it restrains federal courts from hearing not only cases that decrease a state's revenue, but also those that risk disrupting state tax administration."  Joseph v. Hyman, 659 F.3d 215, 218-19 (2d Cir. 2011).

Defendants argue that, in the comity context, "Abuzaid controls this case."  Defs.' Reply at 7.  There, the Second Circuit held that comity barred a District Court from granting injunctive and declaratory relief to plaintiffs challenging a New York tax penalty assessed on them for failing to pay a tax on the sale of cigarettes.  Abuzaid, 726 F.3d at 312.  The court found that, because "such relief would interfere with the state's administration of its tax laws" and plaintiffs had "access to state remedies that [were] 'plain, adequate, and complete,'" federal courts lacked jurisdiction to prevent the state from enforcing the penalty.  Id. at 313, 315.  Defendants argue that here, similarly, comity precludes this court from "striking down [ ] an entire state tax statute" because it "would undoubtedly disrupt state tax administration.  Defs.' Reply at 8.

The court disagrees.  Abuzaid is distinguishable here for the simple reason that the court's holding in that case was premised on its finding that the statute in question "provide[d] a civil penalty – not a criminal punishment."  Abuzaid, 726 F.3d at 315.  In contrast, Weinberg has pled sufficient facts to support a plausible claim that H.B. No. 5033 imposes a punishment.  In this context, the Abuzaid court strongly implied that the branch of the comity doctrine precluding federal courts from disrupting a state's

---

[12] A separate branch of the comity doctrine, Younger abstention, also "generally forbids federal courts from interfering with a state's enforcement of its . . . criminal laws."  This is discussed infra at Section V.A.3.

administration of its own tax laws would not apply.  Id. at 316.  Thus, because Weinberg

has pled facts sufficient to support a plausible claim that H.B. No. 5033 is punitive in

nature and "not a [ ] part of the state's tax system", the tax comity doctrine does not bar

this court from granting him relief.  Id.

          3.     Younger Abstention

However, although the Abuzaid court suggested that the tax comity doctrine

would not bar plaintiffs' claim in that case if the statute was a criminal penalty rather

than a tax provision, it also opined in dicta that another species of the comity doctrine –

Younger abstention – would.  See id. (finding the argument that the New York statute

was "a criminal penalty rather than a tax provision . . . to be without merit" but noting

that, even if the court "viewed [it] as a criminal penalty, and not as part of the state's tax

system, its administration would be similarly protected from federal court interference by

another branch of the comity doctrine", Younger abstention).  As such, defendants next

argue that, if this court finds that H.B. No. 5033 is a punishment, Younger abstention

applies.  Defs.' Mem. at 9-10; Defs.' Reply at 8-10.  Again, they rest their argument

primarily on Abuzaid.  While that case was distinguishable in the tax comity context, it

seemingly provides clear guidance, albeit in dicta, on how to apply Younger to situations

where a court finds that a purported tax operates as "a criminal penalty rather than a tax

provision": if the tax in question is a punishment, then the Younger abstention doctrine

operates as a jurisdictional bar.  Abuzaid, 726 F.3d at 316.

In the face of this opinion, Weinberg points to the fact that "[s]everal months after

the Second Circuit issued its Abuzaid decision, the Supreme Court narrowed the scope

of the Younger abstention doctrine in Sprint Communications, Inc. v. Jacobs, 571 U.S.

69 (2013)."  In Sprint, the court "rejected th[e] three-part [Younger] test" the Second

Circuit had used in <u>Abuzaid</u> "in favor of a categorical approach."  <u>Mir v. Shah</u>, 569 F.

App'x 48, 50 (2d Cir. 2014).  "It clarified that <u>Younger</u> abstention is triggered by only

three categories of state court proceedings: (1) 'state criminal prosecutions'; (2) 'civil

enforcement proceedings'; and (3) civil proceedings that 'implicate a State's interest in

enforcing the orders and judgments of its courts.'"  <u>Id.</u> (quoting <u>Sprint</u>, 571 U.S. at 73).

In contrast to the Second Circuit's pre-<u>Sprint</u> approach to <u>Younger</u> in <u>Abuzaid</u>, which

"focused on the substance of the claims . . . by asking whether they implicated an

important state interest", the "categorical approach outlined by <u>Sprint</u> . . . requires a

criminal proceeding, a civil enforcement proceeding, or a determination that a state

court's ability to perform its judicial function would be otherwise impeded" before federal

abstention is warranted.  <u>Id.</u>  These categories are exhaustive and fully "define

<u>Younger's</u> scope."[13]  <u>Sprint</u>, 571 U.S. at 78.  If the "state-level proceeding[ ]" does fall

into one of these three buckets, then courts in the Second Circuit "will consider [the]

three additional, non-dispositive factors" that drove the <u>Abuzaid</u> court's analysis, namely

"1) whether there is a pending state proceeding, 2) whether that proceeding implicates

an important state interest, and 3) whether the state proceedings affords an adequate

opportunity for judicial review of . . . federal constitutional claims."  <u>Lowell v. Vermont</u>

<u>Dep't of Children and Families</u>, 835 F. App'x 637, 639 (2d Cir. 2020) (internal quotations

and citations omitted).

---

[13] <u>Sprint</u> also explicitly narrowed the test the Second Circuit had used in <u>Abuzaid</u>.  <u>See</u> <u>Sprint</u>,
571 U.S. at 81-82 ("[T]he three [conditions used in <u>Abuzaid</u>] would extend <u>Younger</u> to virtually all parallel
state and federal proceedings, at least where a party could identify a plausibly important state interest.
That result is irreconcilable with our dominant instruction that, even in the presence of parallel state
proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule") (internal
quotations and citations omitted).  It is therefore clear that, post-<u>Sprint</u>, <u>Younger</u> would apply to a more
limited set of cases than it would have when the Second Circuit decided <u>Abuzaid</u>.

The parties agree that here, neither the first nor the third <u>Sprint</u> category applies. Pl.'s Mem. at 16; Defs.' Reply at 8.  The proceeding is not a criminal prosecution, nor does it "touch on a state court's ability to perform its judicial function."  <u>Sprint</u>, 571 U.S. at 79.  Whether or not <u>Younger</u> divests the court of jurisdiction over this action, therefore, depends on whether it can be accurately characterized as a civil enforcement proceeding within the meaning of <u>Sprint</u>.  In <u>Sprint</u>, the Supreme Court defined the civil enforcement proceeding category as "akin to a criminal prosecution in important respects."  <u>Sprint</u>, 571 U.S. at 79 (internal quotations and citations omitted).  More specifically, the genre of civil enforcement actions that come within the scope of <u>Younger</u> "are characteristically initiated to sanction the federal plaintiff, <u>i.e.</u>, the party challenging the state action for some wrongful act."  <u>Id.</u>  "[A] state actor is routinely a party to the state proceeding" as well, and "often initiates the action."  <u>Id.</u>  Finally, such proceedings "commonly involve[ ]" investigations and "often culminat[e] in the filing of a formal complaint or charges."  <u>Id.</u>  However, "[w]hile [the Supreme Court has] expanded <u>Younger</u> beyond criminal proceedings, and even beyond proceedings in courts, [it] ha[s] never extended it to proceedings that are not judicial in nature."  <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 369-70 (1989) (internal quotations and citations omitted).

Here, the court concludes that the <u>Younger</u> abstention doctrine does not preclude it from exercising jurisdiction. As an initial matter, the fact that <u>Abuzaid's</u> discussion of <u>Younger</u>: (1) predated <u>Sprint</u> and; (2) was confined to <u>dicta</u> "casts serious doubt" on the continued relevance of <u>Abuzaid's</u> analysis.  <u>Cavanaugh v. Geballe</u>, --- F. 4th ----, 2022 WL 802764, at *6 (2d Cir. Mar. 17, 2022).  In <u>Cavanaugh</u>, the Second

Circuit re-emphasized a federal court's "'virtually unflagging obligation . . . to exercise the jurisdiction given [to it]." Id. at *1 (quoting Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976)).  It also clarified that, post-Sprint, Younger has a "narrow scope", and that "abstention is the exception, not the rule." Id. at *1, 3 (internal quotations and citations omitted).  The court proceeded to deploy this framework to distinguish a Fourth Circuit case the District Court in Cavanaugh had relied on in holding that Younger divested it of jurisdiction.  First, it observed that the portion of the Fourth Circuit opinion the District Court had relied on was "in dictum." Id. at *5.  This, coupled with the fact that the case "preceded Sprint . . . cast [ ] serious doubt on the Fourth Circuit's analysis." Id.  The same is true here.  Although Abuzaid's discussion of Younger is noteworthy, the fact that it occurred in dicta and applied a standard that the Supreme Court later "rejected" means it is not binding in this case.[14] Mir, 569 F. App'x at 50.

Moreover, other courts have come to different conclusions regarding Younger's application in this context.  For instance, in Lynn the Fourth Circuit asserted jurisdiction and held that a North Carolina purported tax statute similar to the one at issue here was a criminal penalty, without discussing Younger or abstaining on its grounds.[15]  Lynn, 134 F.3d at 595 ("federal courts have jurisdiction to examine a tax that is in reality a criminal penalty").  In addition, both before and after Sprint, courts have consistently

---

[14] The court recognizes that the Cavanaugh decision involved the third Sprint category, not the second at issue here.  However, the court's consideration of the question presented here is greatly informed by the Cavanaugh decision given its discussion regarding the continued relevancy of pre-Sprint cases.

[15] Of course, Lynn was also decided before Sprint.  However, because Sprint narrowed the scope of Younger, it is still noteworthy here.

recognized that plausible double jeopardy claims, as Weinberg has alleged here, can constitute an exception to Younger's application.  See, e.g., Foster v. Murphy, 686 F. Supp. 471, 474 (S.D.N.Y. 1988) ("claims under the double jeopardy clause fit within the exception to the Younger abstention doctrine", and "Younger [is] 'simply inapposite' to a claim of double jeopardy") (quoting Drayton v. Hayes, 589 F.2d 117, 121 n. 7 (2d Cir. 1979)); see also Gates v. Strain, 885 F.3d 874, 882 (5th Cir. 2018) ("[d]ouble-jeopardy claims can constitute the kind of extraordinary circumstances that justify an exception from Younger") (internal citations omitted); Nivens v. Gilchrist, 319 F.3d 151, 159 (4th Cir. 2003) (Younger abstention is not warranted where "petitioners' allegations established a substantial likelihood of an irreparable double jeopardy violation"); Mannes v. Gillespie, 967 F.2d 1310, 1312 (9th Cir. 1992) ("[a] claim that a state prosecution will violate the Double Jeopardy Clause presents an exception to the general rule of Younger").  To be sure, these cases arose in the context of alleged criminal prosecutions that violated the Double Jeopardy clause, rather than punitive monetary penalties.  However, given that Weinberg has plausibly alleged a double jeopardy violation here under Kurth Ranch, it is not clear to the court why his claim would not also present an extraordinary circumstance precluding the application of Younger.  Moreover, at least as applied to Weinberg, the tax assessment was not "judicial in nature."  New Orleans Pub. Serv., Inc., 491 U.S. at 370.  Weinberg alleges that he was simply sent a Notice alerting him of his tax liability while he was incarcerated, and that when he called the state to inquire about his options, they told him that "regardless of what he did, they would get the money one way or another."  Compl. at ¶ 9.  This sort of process – or lack thereof – falls short of the characteristics

the <u>Sprint</u> Court identified as necessary to meet the standard for a civil enforcement proceeding that precludes federal jurisdiction under <u>Younger</u>. <u>See</u> <u>supra</u> at 23.

The Motion to Dismiss is therefore denied as to defendants' argument that the <u>Younger</u> abstention doctrine precludes federal court jurisdiction.

B.   <u>Statute of Limitations</u>

Finally, defendants argue that the court should dismiss Weinberg's action pursuant to Rule 12(b)(6) because the statute of limitations on his section 1983 claims has passed.  Def.'s Mem. at 10-11.  Weinberg counters that defendants are equitably estopped from asserting this defense, as they made material misrepresentations to Weinberg about the remedies available to him when he first received the tax assessment.  Pl.'s Mem. at 17-20.  At the motion to dismiss stage, the court concludes that, accepting the allegations in the Complaint as true and drawing all reasonable inferences in his favor, Weinberg has narrowly met his burden of plausibly alleging that defendants are equitably estopped from asserting their statute of limitations defense.

"A federal court looks to state law to determine the applicable statute of limitations in a Section 1983 action."  <u>Dorlette v. Iozia</u>, No. 3:16-CV-1882, 2020 WL 509564, at *3 (D. Conn. Jan. 31, 2020).  In Connecticut, a plaintiff has three years "from 'the date of the act or omission complained of'" to bring his section 1983 claim.  <u>Id.</u> (quoting Conn. Gen. Stat. § 52-577).  As to when a section 1983 accrues, a federal court would ordinarily "look[ ] to federal law."  <u>Id.</u>  However, an intensive analysis of that issue is not necessary here.  Weinberg does not dispute that he has brought his claim outside the applicable statute of limitations: rather, he argues that defendants are equitably estopped from asserting such a defense.  Pl.'s Mem. at 17-20.

The doctrine of equitable estoppel "'is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit.'" Zeyer v. Board of Educ., 98 F. Supp. 3d 425, 435 (D. Conn. 2015) (quoting Ellul v. Congregation of Christian Bros., 774 F.3d 791, 802 (2d Cir. 2014). "'To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment.'" Id. at 435-36 (quoting Ellul, 774 F.3d at 802). Ultimately, the question of whether equitable estoppel applies is an issue of fact. Petrelli v. City of Mount Vernon, 9 F.3d 250, 256 (2d Cir. 1993).

At this stage, the allegations in Weinberg's Complaint are sufficient to support a plausible inference that both of these prongs are met. Weinberg alleges that he first received notice of his tax liability while he was incarcerated and that, after speaking with fellow inmates, he contacted the state. Compl. at ¶¶ 7-9. When he "talked to the state", they told him that, "regardless of what he did, they would get the money one way or another."[16] Id. at ¶ 9. Of course, this was not necessarily true, as defendants have conceded in their Memorandum: "[t]he statutory scheme of [H.B. No. 5033] authorizes both the right to a hearing before the Commissioner and a right to appeal to the superior court where constitutional objections may be heard." Defs.' Mem. at 8. Thus, Weinberg

---

[16] In his Complaint, Weinberg does not specify with whom he spoke from the state or how he got in contact with that person. Nor has a copy of the original 2002 Notice been filed on the docket. However, subsequent notices sent to him that are attached to the Clato-Day Affidavit provide a number for Weinberg to call "[f]or inquiries regarding this notice." See Aff. of William Clato-Day at 7 (Doc. No. 20-2). Thus, the court draws the reasonable inference in Weinberg's favor that he called the number provided to him on the Notice, and that it was reasonable for him to believe that the person with whom he spoke was authorized to speak on behalf of the state on this subject. Indeed, in his Memorandum, Weinberg argues that this is exactly what occurred. See Pl.'s Mem. at 18.

has alleged that, in his conversations with defendants, they made a definite misstatement of fact.  Given that Weinberg was incarcerated at the time, it is reasonable to infer that he had limited access to information beyond what the state provided him. They would therefore have reason to believe he would rely on whatever information they gave him.  Finally, Weinberg has also alleged that he reasonably relied on that information to his detriment.

Accordingly, the Motion to Dismiss is denied as to defendants' statute of limitations argument.

## VI.    CONCLUSION

For the reasons discussed above, the Motion to Dismiss (Doc. No. 20) is denied.

Because the jurisdictional and statute of limitations arguments defendants raise here are heavily fact-dependent, defendants' Motion is denied without prejudice to them reasserting these same arguments following discovery.

**SO ORDERED.**

Dated at New Haven, Connecticut this 31st day of March 2022.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

28